UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GILBERT J. GERVAIS, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : CIVIL NO:   3:02CV1273 (MRK) |
| | : |
| O'CONNELL, HARRIS | : |
| & ASSOCIATES, INC., et al., | : |
| | : |
| Defendants. | : |

**RULING ON MOTION FOR DEFAULT JUDGMENT**

Pursuant to Rule 55 of the Federal Rules of Civil Procedure, Plaintiff Gilbert Gervais moves for entry of a default judgment [doc. # 1] against Defendants O'Connell, Harris & Associates, Inc. ("OHA") and William Harris (Harris"). For the reasons set forth below, the Court GRANTS Plaintiff's Motion for Default Judgment and enters judgment against OHA and Harris in the amount of $17,720.

I.

Plaintiff brings this action against defendants for violations of the Fair Debt Collections Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA") and Connecticut's Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq. ("CUTPA"). Plaintiff alleges that defendants violated the FDCPA and CUTPA in connection with their efforts to collect a debt for which the statute of limitations had long since expired.

Plaintiff's original complaint dated July 23, 2002 [doc. # 1], was brought against only OHA, a debt collection business based in Stoneham, Massachusetts and John Riley, an individual who called plaintiff to collect the debt in question and who claimed to be associated with OHA. In February 2003, the Court granted plaintiff's motion to amend his complaint [doc. # 7] to join as additional defendants William Harris of OHA and Phillip O'Connell of OHA, both of whom are residents of Massachusetts. The Amended Complaint also alleged that OHA was the alter ego of Harris and O'Connell and that they had established OHA "as a cloak for the evasion of obligations, as a mask behind which to do injustice, and as a means to subvert equity." Amended Complaint at 9. Plaintiff was able to effectuate service of the Complaint on OHA and the Amended Complaint on Harris, but plaintiff was unable to effectuate service on O'Connell or Riley. In fact, plaintiff believes that "John Riley" was actually a pseudonym used by either Harris or O'Connell or someone else working for OHA.

On September 2, 2003, this Court granted plaintiff's motion to default OHA and Harris for failure to appear [doc. # 13]. Thereafter, plaintiff moved for a default judgment against both OHA and Harris [doc. # 15]. In support of default judgment, plaintiff submitted declarations of his counsel regarding attorneys fees [doc. ## 14 and 16]. In addition, the Court held a hearing on damages on December 15, 2003, at which plaintiff appeared and testified and submitted documentary evidence in support of his claim. At the December 15 hearing, plaintiff agreed voluntarily to dismiss his claims against Riley and O'Connell under Fed. R. Civ. P. 41(a)(1). Therefore, the only issue remaining is the amount of damages to be awarded plaintiff against OHA and Harris.

II.

Because of the default entered against OHA and Harris, the Court accepts as true all of the factual allegations of the complaint, except those relating to damages. *See, e.g., Au Bon Pain Corp. v. Artect, Inc.,* 653 F.3d 61, 65 (2d Cir. 1981); 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 2688, at 58-59 (3d ed. 1998). Moreover, plaintiff testified at the December 15 hearing regarding the factual basis of his claims, as well as his damages. Based on that testimony and the documents and Declarations submitted, the Court makes the following findings.

In or about 1993, plaintiff, who is 64, suffered several heart attacks and a stroke. These physical setbacks caused him to withdraw from his businesses and to begin collecting disability benefits from the Social Security Administration. In November 1993, plaintiff found himself unable to make monthly payments on three Citibank credit cards. Between November 1993 and 2002, plaintiff made no payments on these credit cards, the total outstanding balance of which was less than $5,000. Over the years, plaintiff would occasionally receive letters from Citibank or persons purporting to collect on the Citibank debt, but plaintiff ignored those letters. In particular, plaintiff marked as exhibits at the hearing three letters (one each in 2000, 2001 and 2002) from Arrow Financial Services each offering to compromise the Citibank debt for relatively nominal amounts (ranging from $150 to $234). Plaintiff ignored each letter because, he says, he believed that the statute of limitations had long since run on the Citibank debt.

In March 2002, plaintiff agreed to co-sign a loan application for his granddaughter and in connection with that application he disclosed his assets, which included a bank account containing $3,000 or more. Plaintiff immediately began to get letters from individuals seeking to collect on the Citibank credit card debt. Once again, plaintiff ignored those letters. On June 28,

2002, a "John Riley" left a message on plaintiff's answering machine. Not knowing that Riley was a debt collector, plaintiff called him back. Later that day, Riley and plaintiff spoke and Riley identified himself as "John Riley, from O'Connell, Harris and Associates." Riley said he was an attorney hired to do an asset search on plaintiff and that his client would be "happy" to learn what he had found about plaintiff's assets. In fact, OHA is not a law firm and there is no lawyer named John Riley in Massachusetts. Also, OHA, which is a debt collection agency that closed its doors shortly after his lawsuit was filed, is not licensed as a debt collector in Connecticut.

Plaintiff was frightened by the phone call and thought that Riley would now seek to take his bank account and apartment to satisfy the Citibank debt. Plaintiff did not sleep that night and took anti-anxiety medication. The next morning, plaintiff called Riley, who told plaintiff that Riley's client would accept a "settlement" of $4,750. When plaintiff said that was too much, Riley eventually agreed to accept $2,500 in "full settlement" of plaintiff's debts.

Plaintiff was confused at this point because he thought that the statute of limitations had run on the Citibank debt, but he was concerned because an attorney was now involved and he thought the attorney would begin proceedings to seize his assets. Plaintiff asked Riley to send him the paperwork and because he was going away for the July 4th holiday, plaintiff said he would get back to Riley on July 5. Riley told plaintiff that July 5 was "too late," that his client needed the $2,500 no later than July 1 and that Riley would get plaintiff the paperwork after-the-fact.

Plaintiff then told Riley he would send him a check, but Riley said he needed plaintiff's bank account information so that he could arrange for the funds to be withdrawn from plaintiff's bank account before plaintiff left for the July 4th holiday. Plaintiff asked Riley if the statute of

limitations had run on the Citibank debt, and Riley told plaintiff that the limitations period ran from the last payment and that his records showed that plaintiff had "made a token payment a few years ago." In fact, however, plaintiff had never made such a token payment, and Riley made that false statement purposefully to convince plaintiff that the Citibank debt was still valid and owed, when it was not.

Plaintiff testified that he was confused at this point and also fearful both of losing his other assets and of having another heart attack or stroke. Plaintiff, therefore, gave Riley the requested bank account information, and Riley withdrew $2,500 from plaintiff's bank account, payable to an OHA account. Plaintiff never received any paperwork from Riley, let alone a release or settlement agreement, and Riley had no intention of ever providing plaintiff with that paperwork. Also, plaintiff has continued to receive written demands for payment of the same Citibank debt that Riley claimed the payment of $2,500 would settle.

### III.

Plaintiff seeks several categories of recovery, and the Court will discuss them in turn.

First, plaintiff seeks recovery of the $2,500 that Riley withdrew from plaintiff's bank account. Because defendants violated the FDCPA in numerous respects, as well as CUTPA, the Court awards plaintiff $2,500 as actual damages. *See* 15 U.S.C. § 1692k(a); Conn. Gen. Stat. § 42-110g(a).

Second, plaintiff seeks $4,000 for emotional distress that he suffered in connection with defendants' acts. The FDCPA permits a court to award damages for emotional distress. *See Conboy v. AT&T Corp.*, 84 F. Supp.2d 492, 507 (S.D.N.Y. 2000)("emotional distress damages are recoverable in cases alleging a violation of the FDCPA"). The Court is sympathetic with

plaintiff's claim and believes that he did, in fact, suffer some emotional distress as a result of defendants' heavy-handed and unlawful conduct. However, the events in question were brief in time; plaintiff concedes that defendants never expressly threatened him; he acknowledges that he did not need the care of a physician as a result of these events; and plaintiff testified that he regularly takes anxiety pills for fears relating to his physical condition that are unrelated to the events in question. Accordingly, the Court awards plaintiff $1,500 for emotional and mental distress damages under FDCPA, bringing plaintiff's total actual damages to $4,000.

Third, plaintiff seek punitive damages under CUTPA (no such damages are authorized by FDCPA, *see* 15 U.S.C. § 1692k). In particular, plaintiff seeks a punitive award of nine times actual damages. Plaintiff justifies a nine-fold multiple in large part based upon his assertion that defendants have engaged in the same illegal conduct with others. However, plaintiff did not provide any proof of such conduct, and none is alleged in the Amended Complaint. Based upon the allegations of the Amended Complaint, which the Court must accept as true, and the testimony during the hearing on damages, the Court finds that defendants did act willfully, knowingly and fraudulently in an effort to deceive plaintiff. Therefore, the Court concludes that punitive damages are warranted in this case. However, in view of the evidence presented, the Court will award punitive damages of $8,000, which is twice plaintiff's actual damages described above.

Finally, plaintiff seeks recovery of reasonable attorneys' fees and costs under both CUTPA and FDCPA. Plaintiff has established that he had incurred costs of $320 for filing fees, constable fees and postage. The Court finds those costs to be reasonable. Plaintiff's attorney represented to the Court that he regularly bills his clients at $200 per hour for work that he does

6

not perform on a contingent fee basis. Accordingly, the Court finds that a fee of $200 per hour is a reasonable hourly rate in this case. Plaintiff also submitted proof that through the December 15 hearing, he had spent 27 hours on this case, which the Court finds is reasonable. Applying the factors of the lodestar test, the Court finds that an attorneys' fee award of $5,400 is reasonable and appropriate in this case.[1] *See Gisbrecht v. Barnhart* 535 U.S. 789, 802 (2002) ("The lodestar method today holds sway in federal-court adjudication of disputes over the amount of fees properly shifted to the loser in the litigation"); *see also Hensley v. Eckerhart*, 461 U.S. 424, 433 ("It remains for the district court to determine what fee is 'reasonable.'").[2]

Plaintiff's recovery totals $17,720. Accordingly, the Court GRANTS plaintiff's Motion [doc. # 1] and enters judgment for plaintiff and against O'Connell, Harris & Associates, Inc. and William Harris, jointly and severally, in the total amount of $17,720.

**The Clerk is directed to close this case.**

---

[1] Plaintiff also asked this Court to award him the likely fees that he will incur in enforcing this judgment. However, at the hearing, plaintiff acknowledged that he did not have any legal authority that would permit the Court to make such an award, and the Court declines to do so.

[2] The lodestar test begins by multiplying "the number of hours reasonably expended on the litigation" by the prevailing party's attorneys by a "reasonable hourly rate." *Hensley*, 461 U.S. at 433. This amount can be adjusted by considering the following twelve factors: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Id.* at 430, n.3.

IT IS SO ORDERED.

/s/    Mark R. Kravitz
           U.S.D.J.

Dated at New Haven, Connecticut: December 23, 2003.